UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21594-CIV-MORENO/SIMONTON
<u>CONSENT CASE</u>

**FIDENCIO QUIROZ,**

    Plaintiff,

v.

**SUPERIOR BUILDING**
**MAINTENANCE, INC. et al.,**

    Defendants.
_____/

<u>ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS FOR WITNESS TAMPERING</u>

    This cause comes before the Court on the Motion to Dismiss for Witness Tampering, filed by Defendants, Superior Building Maintenance, Inc., Superior Building Maintenance of the Virgin Islands, Inc., Superior Building Maintenance of Puerto Rico. Inc., SBM of Davie, Inc., and Wallace Parrish (collectively, "Defendants") (DE # 37). Plaintiff, Fidencio Quiroz, responded (DE # 38) and Defendants replied (DE # 39). The parties have consented to the jurisdiction of the undersigned Magistrate Judge (DE # 23). An evidentiary hearing was held on December 3-4, 2007.[1] After a careful review of the record and the arguments made by counsel at the evidentiary hearing, and for the reasons stated herein, Defendants' motion to dismiss is **GRANTED**.

    In his amended complaint, Mr. Quiroz alleged that Defendants, his employers,

---

[1] During a hearing on December 3, 2007, this Court received the parties' evidence and witness testimony. December 4, 2007 was reserved for closing argument only.

1

failed to pay him overtime wages during a three-year period,[2] in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. (DE # 30, Ex. A).  While preparing their defense of Mr. Quiroz's FLSA claims, Defendants were informed by Luis Martinez, a co-worker of Mr. Quiroz, that Mr. Quiroz had offered to pay him in exchange for favorable testimony in the FLSA litigation.  Defendants reported Mr. Martinez's claims to law enforcement authorities, including the Federal Bureau of Investigation ("FBI"), which arranged for Mr. Martinez to call Mr. Quiroz and discuss his illicit offer in a recorded telephone conversation.

Defendants argue, and the undersigned agrees, that this Court should exercise its inherent authority to prevent and deter egregious litigation misconduct by dismissing Mr. Quiroz's substantive claims based on his actions in connection with his attempt to solicit untruthful testimony and to cover-up his wrongdoing.

## I.   BACKGROUND

The findings of fact that the undersigned makes in connection with the instant motion are drawn from the pleadings and the evidence placed in the record by the parties, which includes Fidencio Quiroz's affidavit and in-court testimony; Luis Martinez's affidavit and in-court testimony; and the transcript of telephone call between Fidencio Quiroz and Luis Martinez that was recorded by the FBI.

It is undisputed that Luis Martinez and Mr. Quiroz both worked as janitors for defendant Superior Building Maintenance, Inc. ("Superior"), which was owned by

---

[2] The relevant period of time that Mr. Quiroz was not paid for his overtime labor is unclear.  His statement of claim states that he was owed wages for worked performed from June 23, 2003 to May 1, 2005 (DE # 7), while his amended complaint states that he did not begin working until approximately July 9, 2003 and stopped working on June 16, 2006 at the earliest (DE # 30, Ex. A at ¶ 9).

defendant Wallace Parrish. According to Mr. Martinez, he first discussed the case at bar with Mr. Quiroz between four and six months before the hearing, but he could not be sure whether that conversation occurred before or after Mr. Quiroz filed his initial FLSA complaint against Defendants.

    A.    <u>Luis Martinez's In-Court Testimony</u>

The Court finds Mr. Martinez to be a credible witness and accepts his testimony as an accurate representation of the relevant events leading up to the telephone call which was recorded by the FBI.

Mr. Martinez testified that Mr. Quiroz first discussed his FLSA case with him during a telephone conversation. Their discussion began when Mr. Quiroz asked Mr. Martinez if he would like to earn $1,000.00. Mr. Martinez asked what he would be required to do in order to earn the money, and Mr. Quiroz responded that someone – presumably Mr. Quiroz's attorney – would contact Mr. Martinez and, when he did, Mr. Martinez should say that he worked with Mr. Quiroz for Superior. During the course of that conversation, Mr. Quiroz repeatedly reminded Mr. Martinez to remember to mention that Mr. Quiroz worked eight hours per day, seven days per week and never took a day off during the three years that encompassed Mr. Quiroz's FLSA allegations. Mr. Martinez agreed that Mr. Quiroz worked with him for Superior, but explained that he knew that Mr. Quiroz had not worked eight hours per day, seven days per week for three consecutive years, as Mr. Quiroz suggested. The conversation ended without Mr. Martinez either accepting or declining Mr. Quiroz's offer.

At the evidentiary hearing, Mr. Martinez openly acknowledged that he only worked with Mr. Quiroz on the same job site on a handful of occasions during his four or five years with Superior. He insisted, however, that he knew Mr. Quiroz did not work eight

3

hours per day, seven days per week for an uninterrupted three year period because 1) the staff was like a "family," and no one worked seven days per week; and 2) because Mr. Martinez talked to Mr. Quiroz over the telephone on days when Mr. Quiroz was absent from work.

Despite the fact that Mr. Quiroz never *expressly* conditioned payment on Mr. Martinez's willingness to lie about Mr. Quiroz's overtime hours, Mr. Martinez testified that it would not make sense for Mr. Quiroz to offer to pay him to corroborate that Mr. Quiroz worked for Superior. He emphatically asserted at the evidentiary hearing that Mr. Quiroz was aware that Mr. Martinez did not believe that he worked eight hours per day, seven days per week for three years and that Mr. Quiroz's repeated pleas to "remember" facts to the contrary were clear, albeit implicit, orders to testify consistent with Mr. Quiroz's version of the facts in order to receive the $1,000.

After their initial telephone conversation, Mr. Martinez testified that he subsequently had one or two similar conversations with Mr. Quiroz before alerting his employers or the FBI. During those conversations, Mr. Quiroz also offered to pay Mr. Martinez's wife, Sandra, $1,000.00 to speak to Mr. Quiroz's attorney and represent that Mr. Quiroz worked seven days a week and that he worked overtime. Mr. Martinez explained to Mr. Quiroz that, after discussing the matter with his wife, neither of them was willing to accept his offer.

Later, Mr. Martinez discovered that his name had been included on a list of potential witnesses in Mr. Quiroz's upcoming FLSA litigation, which angered him because he had not agreed to be a witness in the case. He explained to Mr. Wallace that he had refused to testify on Mr. Quiroz's behalf. A few days later, Mr. Martinez again approached Mr. Wallace, this time to report that he had been offered $1,000 by Mr.

Quiroz in exchange for his testimony, but that he had refused.

Armed with this knowledge, Defendants paid for independent counsel to represent Mr. Martinez and contacted law enforcement officials, who initiated an investigation. As part of that investigation, Mr. Martinez agreed to allow the FBI to record a telephone call in which he would attempt to get Mr. Quiroz to discuss their proposed arrangement (DE # 37, Ex. A).

### B. The Parties' Affidavits

Defendants filed their motion to dismiss before the FBI released a transcript of the recorded telephone call. Defendants thus relied on an affidavit signed by Mr. Martinez, describing the circumstances surrounding Mr. Quiroz's attempt to pay for his testimony (DE # 37, Exh. A).[3]

Mr. Quiroz's brief in opposition to the motion to dismiss, which was also filed before the FBI transcript was released, included an affidavit of his own. In the affidavit, Mr. Quiroz claimed that, when Mr. Martinez discussed payment for his testimony in the FLSA case, Mr. Quiroz told him that he was "'crazy' and . . . hung up the phone;" and, when Mr. Martinez subsequently tried to call him back, Mr. Quiroz stated in his affidavit that he did not answer the phone (DE # 38, Exh. A at ¶ 6).

---

[3] Defendants' counsel seized upon Mr. Martinez's confusion surrounding his affidavit, including the fact that recognized his signature and the text on the second page of his affidavit (which contained the core statement that "Quiroz offered to pay me one thousand dollars . . . to give the testimony he was requesting[, and w]hen I said no, Quiroz offered to pay my wife one thousand dollars"), but did not recognize the first page of the affidavit. For reasons explained in more detail below, the undersigned concludes that Mr. Martinez's confusion on this point is not significant, in light of the record as a whole and the fact that he clearly and unambiguously stated at the evidentiary hearing that he understood Mr. Quiroz to have offered him $1,000 to testify to facts that he knew to be false.

5

## C. The FBI Transcript

The transcript of the final conversation between Messrs. Quiroz and Martinez, which was recorded by the FBI, was filed after Defendants' reply brief (DE # 39). The transcript comports with the description of events contained in Mr. Martinez's affidavit and in-court testimony, and conflicts with Mr. Quiroz's affidavit and in-court testimony.

Over the course of that call, Mr. Martinez refers, on multiple occasions, to payments that Mr. Quiroz agreed to make to him in connection with Mr. Quiroz's FLSA claims, and not only did Mr. Quiroz fail to call Mr. Martinez "crazy" and hang up, as he said he did in his affidavit, but the transcript reflects that he did not seem surprised or confused by Mr. Martinez's repeated references to an agreement to pay him $1,000.

For instance, when Mr. Quiroz offers to give Mr. Martinez his "cheese" when they go to court and Mr. Martinez asks whether he will "give [him] the thousand [d]ollars before or after," Mr. Quiroz responds that the payment "has to be after, brother" (DE # 54, Ex. A at 4).[4]

Second, when Mr. Martinez, presumably in reference to an agreement in which both he and his wife, Sandra, will testify falsely on Mr. Quiroz's behalf, asks whether Mr. Quiroz will "give me (unintelligible) and, only three thousand," "if we do that thing," Mr. Quiroz explains shortly thereafter that "if they give me a good chunk, I'll give you some. That's no problem" (DE # 54, Ex. A at 5).

Third, when Mr. Martinez says, "in other words, you'll give me the thousand if I (unintelligible), right?" Mr. Quiroz responds, "Sure" (DE # 54, Ex. A at 6).

---

[4] In a related exchange, Mr. Martinez again refers to "one thousand [d]ollars," in the context of a discussion he had with his wife, and the transcript indicates that Mr. Quiroz continued to participate in the conversation (DE # 54, Ex. B at 4).

**6**

Significantly, when their call is interrupted by Mr. Quiroz's son calling on the other line, Mr. Quiroz says to Mr. Martinez, "don't hang up, don't hang up, okay?" (DE # 54, Ex. A at 7).

Elsewhere in the transcript, Mr. Quiroz inquires about another co-worker, Lauro Cabana, who he apparently attempted to pay to give testimony as well.  Mr. Quiroz asks if Mr. Martinez is able to contact Mr. Cabana, and when Mr. Martinez asks whether "it's for the same thousand only," Mr. Quiroz answers, "I don't know.  I don't know.  It depends on what . . .  I'll tell the attorney how much there is, and how much money he'll get back" (DE # 54, Ex. A at 11).

Immediately preceding the end of their conversation, Mr. Quiroz inexplicably says, "I, I can't offer you anything . . . now, because you backed down that day, I already . . . what am I supposed to do?"  He continued, "I haven't offered anything to anybody," and, referring to Mr. Martinez, "I told you that day.  I told you that joking around to see . . . if you'd, you know, to see how you'd react.  But no way, who the hell am I going to be paying?  If you want, you can serve as witnesses, and if you don't, then you won't. . . . I don't have left over money to give anybody[;] not even a single [d]ollar, [y]ou know? . . . [A]nd I, in good faith, . . . if anyone supports me, I may give them something. But no way, what the hell am I going to be giving you . . .?"

D.     Fidencio Quiroz's In-Court Testimony

Defendant Quiroz testified at the December 3, 2007 evidentiary hearing.  Mr. Quiroz attempted to explain how the version of events that Mr. Martinez presented in his affidavit and testimony was incorrect and how the statements in Mr. Quiroz's affidavit were not borne out in the FBI transcript of the telephone call between Messrs. Quiroz and Martinez.  The undersigned finds that Mr. Quiroz is not a credible witness and that

7

his attempts to discredit Mr. Martinez and explain the discrepancies apparent in his own testimony are unavailing.[5]

First, at the evidentiary hearing, Mr. Quiroz repeated the assertion he made in his affidavit – namely, that he called Mr. Martinez crazy and hung up the phone when Mr. Martinez suggested that Mr. Quiroz should pay him to testify – but could not explain why the FBI transcript did not reflect any such exchange.  Nor could Mr. Quiroz explain how to square his sworn testimony that he abruptly hung up on Mr. Martinez when he suggested that Mr. Quiroz pay him for favorable testimony with the portion of the FBI transcript that shows him pleading with Mr. Martinez not to hang up when Mr. Quiroz was interrupted by a telephone call from his son on the other line even after Mr. Martinez had already mentioned a $1,000 payment numerous times up to that point.

Second, Mr. Quiroz emphasized that he did not, at any point during the FBI transcript, express a desire to pay Mr. Martinez any particular sum of money.  However, he failed offer a satisfactory explanation for his failure to react when the discussion turned to Mr. Quiroz's willingness to pay Mr. Martinez and other potential witnesses such as his wife, Sandra, or Mr. Cabana.

Third, Mr. Quiroz insisted that he was unable to recall the most basic facts about other people to whom he offered money to testify.  For example, when he was

---

[5] The undersigned rests her resolution of Mr. Quiroz's unreliability on the inconsistencies that pervade the core of his testimony, as discussed in more detail herein.  It should be noted, in addition, that Mr. Martinez's demeanor during his examination before the Court conveyed a greater sense of trustworthiness than Mr. Quiroz's nervous and somewhat erratic disposition, and where the testimony of the two witnesses is mutually incompatible (which is often), the undersigned credits Mr. Martinez's version of events.  Also, Mr. Quiroz admitted that he obtained and utilized false immigration documents, an act that is indicative of his character for untruthfulness and a valid basis for impeaching his testimony during the evidentiary hearing.

questioned about passages of the FBI transcript that clearly referred to Mr. Quiroz's offer to pay Sandra for her testimony during the evidentiary hearing, he claimed that he did not to remember who he was referring to when he used the pronouns "she" and "her" to refer to Sandra; that he never spoke to Sandra about his FLSA case; and that he had "no idea" what he was saying in a paragraph expressing frustration over a female witness (presumably Sandra) refusing to offer testimony to support his claims.

Similarly, Mr. Quiroz denied ever offering Lauro Cabana money to testify, and claims that "he had no idea about" such an arrangement despite the fact that the FBI transcript depicts Mr. Martinez asking Mr. Quiroz whether "it's for the same thousand only" shortly after he and Mr. Quiroz discussed how to contact Mr. Cabana.  Mr. Quiroz relied on his testimony that Mr. Martinez "invented" the notion that Mr. Quiroz would pay witnesses for their testimony, which angered him so much that he refused to answer Mr. Martinez's calls.  However, he failed to explain the glaring omission of any indication of such ire towards Mr. Martinez in the FBI transcript.

Mr. Quiroz maintained that when he expressed disgust on the FBI transcript over Mr. Martinez's attempts to "back down" from a prior agreement, he was referring to Mr. Martinez's willingness to testify on his behalf, but did not involve an agreement that Mr. Quiroz would pay him $1,000.  To the extent that he was amenable to paying any amount of money to witnesses willing to testify favorably in his FLSA case, Mr. Quiroz admitted that he was willing to give a "tip" to cover the cost of transportation to court for witnesses that would support him, but that he did not intend to offer a *quid pro quo* in order to secure favorable testimony.

Finally, during his testimony at the evidentiary hearing, he also relied heavily on an apparently unprompted monologue near the end of the FBI transcript, in which he

claims that he was "joking around" when he discussed the possibility of paying anyone to serve as a witness.

## II. LEGAL STANDARD

As the United States Supreme Court has recognized, the authority to sanction parties for bad faith litigation misconduct stems not only from the Federal Rules of Civil Procedure and the United States Code, but also from the Court's inherent power to effectively manage its affairs by punishing and deterring abuses of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991). The inherent power to sanction encompasses the power to dismiss an action, which is appropriately exercised particularly where a party "commits perjury or . . . doctors evidence" that "relates to the pivotal or 'linchpin' issue in the case." *Qantum Comms. Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007) (citing *Vargas v. Peltz*, 901 F. Supp. 1572, 1581-82 (S.D. Fla. 1995)).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Therefore, the Eleventh Circuit has explained, "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) (alteration in original) (citing *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). Before dismissing an action pursuant to its inherent authority to impose sanctions, the Court must find by clear and convincing evidence not only that the misconduct was committed in bad faith, but also that no lesser sanction would adequately punish and deter the violation. *See Qantum*, 473 F. Supp. 2d at 1269-70; *Lanier v. Greaves*, 02-20100-CIV-JEM, 2006 WL 680547 (S.D. Fla. Mar. 13, 2006) (dismissing case based on clear and convincing evidence that plaintiff attempted to induce a witness to provide favorable testimony in exchange for some

10

proceeds of his civil lawsuit).[6]

## III. ANALYSIS

### A. Bad Faith

The undersigned finds that the combination of 1) Mr. Quiroz's attempt to tamper with witnesses by providing them a portion of his FLSA recovery in exchange for favorable testimony; 2) his perjured affidavit; and 3) his dishonest testimony at the evidentiary hearing clearly and convincingly establish his bad faith litigation misconduct, warranting the imposition of sanctions against him.

Based on the substantial evidence in record as a whole, this Court finds that Mr. Quiroz attempted to bribe at least three witnesses in order to shore up his FLSA claim against Defendants. First, Mr. Quiroz attempted to induce Mr. Martinez to perjure himself by offering to pay him $1,000 to attest to the fact that Mr. Martinez worked for Superior with Mr. Quiroz and that Mr. Quiroz worked eight hours per day, seven days per week for three consecutive years. Second, when Mr. Martinez rejected Mr. Quiroz's offer to testify

---

[6] The undersigned notes that there is some authority suggesting that there must be clear and convincing evidence of prejudice to the opposing party – in addition to clear and convincing evidence of bad faith and the unavailability of a lesser sanction – before dismissal is permitted. *See Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 131 (S.D. Fla. 1987) (entering default judgment in favor of plaintiff as a consequence of defendant's disobediance of discovery rules). The prejudice to Defendants arising from Mr. Quiroz's attempt to purchase favorable testimony and his subsequent unwillingness to admit it in his testimony during the evidentiary hearing in the instant action is self-evident, and this Court expressly finds that Mr. Quiroz has so tainted the proceedings that Defendants are prejudiced by virtue of being precluded from presenting a defense on the merits. *See Bernal v. All American Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1339 (S.D. Fla. 2006); *see also Qantum Comms. Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249, 1276-77 (S.D. Fla. 2007) (quoting *Chemtall, Inc. v. Citi-Chem, Inc.*, 992 F. Supp. 1390, 1409-10 (S.D. Ga. 1998)) ("Use of the 'ultimate sanction' addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole . . . . Those who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up . . . consuming substantial resources to respond to and 'undo' the victimizer's lies and distortions.")

falsely for a portion of his litigation proceeds, Mr. Quiroz made the same offer to Mr. Martinez's wife, Sandra. It is also apparent, based on the FBI transcript, that Mr. Quiroz had conceived an inchoate scheme to synchronize the fabricated testimony of multiple witnesses – including Messrs. Martinez and Cabana – which ultimately failed.

Mr. Quiroz, in his defense, points out the exception to the criminal witness bribery statute that applies to a party's offer to reimburse a witness for the cost of travel to court and the reasonable value of time lost while attending court proceedings; and, he contends that any offers he made to witnesses in this matter fit within that exception. 18 U.S.C. § 201(d). However, Mr. Quiroz had offered to pay between $1,000 and $3,000 to witnesses (or combinations of witnesses) who would testify in his favor in the FLSA litigation; and, there is no basis to conclude that $1,000-$3,000 is a reasonable value of compensation for travel expenses and time lost.

Moreover, this Court is not swayed by Mr. Quiroz's assertions that the FBI transcript shows that he did not explicitly mention a specific sum of money to any witness in exchange for favorable but untruthful testimony. When reading the FBI transcript as a whole and considering it within the context of the entire record, Mr. Quiroz's silence on the FBI transcript amounts to an implicit admission of the fact that he intended to pay witnesses in sums that far exceeded the reasonable cost of their travel expenses and value of lost time.[7] In other words, it is clear that Mr. Martinez was

---

[7] This situation is akin to the hearsay exception for an adoptive admission by a party opponent when he hears, understands and acquiesces to a statement that would normally induce an innocent person to respond. *See U.S. v. Joshi*, 896 F.2d 1303, 1311 (11th Cir. 1990). Surely, Mr. Quiroz did not fail to hear or understand Mr. Martinez each of the six times that Mr. Martinez referred to paying a witness $1,000 or the one time that he suggested a $3,000 payout, and he would have surely balked at such a suggestion if his testimony that he did not attempt to bribe witnesses was truthful.

referring back to offers Mr. Quiroz made during prior, unrecorded conversations when he discussed Mr. Quiroz's willingness to pay potential witnesses thousands of dollars for favorable testimony. One striking example, among others in the FBI transcript, occurs when Mr. Quiroz tells Mr. Martinez, "[T]he day they call you, I'll give you your cheese. We'll go to court there, and . . . ." At that point, Mr. Martinez interrupts Mr. Quiroz and asks whether he will pay him "the thousand [d]ollars . . . before or after?" While it is true that Mr. Martinez, not Mr. Quiroz, explicitly said the words "one thousand dollars," Mr. Quiroz does not express confusion or surprise at that figure, but rather responds blithely, "What do you mean before? It has to be after, brother." In this context it is clear that Mr. Quiroz's reference to "cheese" is not meant literally, nor can it reasonably be interpreted to refer to cab fare.

The analysis does not end here, however, because running afoul of the criminal bribery statute does not constitute bad faith *per se*. For instance, a finding of bad faith would be inappropriate in the case of an unsophisticated litigant who expresses his desire to share the proceeds of his lawsuit with family members who also happen to be potential witnesses already willing to testify truthfully on his behalf, even if that litigant would be subject to criminal sanctions. However, the case at bar does not present such an innocent scenario: Mr. Quiroz's mendacity regarding the circumstances surrounding his scheme to bribe witnesses clearly and convincingly establishes his bad faith conduct in these proceedings.

Unlike the scenario described above, Mr. Quiroz's did not want to share the litigation proceeds with Mr. Martinez in exchange for his *truthful* testimony. Rather, Mr. Quiroz was aware of the fact that Mr. Martinez was disinclined to bolster his theory of the case, and offered him $1,000 to change his mind. The fact that Mr. Quiroz never

13

explicitly told Mr. Martinez to lie under oath is irrelevant.  Knowing that Mr. Martinez disagreed with the accounting of overtime hours that Mr. Quiroz claimed in his FLSA suit, Mr. Quiroz's repeated admonitions that his payment was conditioned on Mr. Martinez's memory that Mr. Quiroz worked eight hours per day, seven days per week for three years cannot be described as anything but an attempt induce Mr. Martinez to perjure himself.  Just as Mr. Quiroz's care to avoid expressly mentioning a particular sum of money are not relevant to determine whether he offered to pay witnesses in fact, his similar care to avoid using the word "lie" during his discussions with Mr. Martinez no more shield him from the consequences of the clear import of his words than the drug dealer who refers to his wares by a coded name.

Moreover, Mr. Quiroz responded to Defendants' motion to dismiss by providing untruthful testimony in his affidavit and during the evidentiary hearing.  Not only does his untruthful testimony constitute bad faith in its own right, but it also suggests that Mr. Quiroz is attempting to conceal his bad faith motivations underlying his offer to pay supportive witnesses.

For example, if Mr. Quiroz had pure intentions with regard to his willingness to pay witnesses, there would be no need for him to state in his affidavit and to maintain at the evidentiary hearing that, during the conversation recorded by the FBI, he called Mr. Martinez crazy and hung up on him when Mr. Martinez suggested that Mr. Quiroz pay him $1,000 in connection with the FLSA lawsuit.  Considering the frequency with which Mr. Martinez discussed Mr. Quiroz's willingness to pay witnesses without garnering any reaction at all from Mr. Quiroz, the Court simply does not believe Mr. Quiroz's claim that the FBI transcript failed to record the portion of his conversation with Mr. Martinez in which he angrily hung up the phone when Mr. Martinez broached the topic of witness

tampering.  Similarly, Mr. Quiroz insisted in his affidavit and at the evidentiary hearing that he was not involved in a scheme to offer Mr. Martinez's wife, Sandra, money to testify.  However, at the evidentiary hearing, when he was presented with passages in the transcript referring to his earlier offers to pay Sandra for her testimony and his frustration that she had "refused to back [him] up, [and] wouldn't say anything" in the context of his FLSA litigation, Mr. Quiroz asserted that he "flatly refused" Mr. Martinez's suggestion that he offer Sandra $1,000 to testify and that he could not remember who he could have been referring to in the conversation that had refused to "back him up" and testify in the FLSA case.  These instances of untruthfulness not only fail to obscure Mr. Quiroz's dishonest acts, but are also indicative of Mr. Quiroz's awareness that he would be well-served by attempting to obscure them.

   Finally, Mr. Quiroz draws the Court's attention to the extended and seemingly unprompted assertions at the end of the tape-recorded conversation with Mr. Martinez in which he states:

> I haven't offered anything to anybody. . . .  I told you that day, I told you that joking around to see . . . if you'd, you know, to see how you'd react.  But no way, who the hell am I going to be paying?  If you want, you can serve as witnesses, and if you don't, then you won't.

Mr. Quiroz argues that those statements militate against a finding of bad faith because they show that he never intended to bribe witnesses for favorable testimony, or alternatively, if he had offered to bribe witnesses, that he rescinded the offer.  The undersigned disagrees.  It is possible that Mr. Quiroz had a hunch that the conversation was being recorded, and he was inspired by that concern to not only avoid using mentioning a specific dollar amount, but also by adding this "disclaimer" at the end of the conversation.  Even if he meant what he said, it is detrimental to his opposition of

the pending motion to dismiss, since his "retraction" is inherently inconsistent with his prior testimony, in which he claimed that he *never* offered anyone any money to testify on his behalf and that it was Mr. Martinez who first suggested that Mr. Quiroz pay witnesses for favorable testimony.

### B. No Lesser Available Sanction

The undersigned also finds, based on clear and convincing evidence, that no lesser sanction would adequately deter and punish the bad faith litigation misconduct perpetrated by Mr. Quiroz. The fact that the wrongdoing was so "closely intertwined" with the merits of the case underscores the severity of the sanction that must be imposed in order to "calibrate the scales" in response to Mr. Quiroz's interference with these proceedings. *Qantum Comms. Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249, 1277-78 (S.D. Fla. 2007).

This Court finds that monetary sanctions fail to address the severity of Mr. Quiroz's acts of witness tampering and perjury, which threaten the public's trust in our system of justice and disparage the core values for which it stands. *Young v. Office of the United States Sergeant at Arms*, 217 F.R.D. 61, 71 (D.D.C. 2003) ("[S]eeking to obtain or manufacture false testimony 'strikes at the heart of the judicial system.'"). Litigants should not be left with the impression that they can abuse the judicial process and opposing parties by fabricating evidence concerning the core of their case and simply pay a fine to absolve their misdeeds. In addition, the record as a whole, which includes Mr. Quiroz's own statements during the conversation recorded by the FBI, as well as his testimony at the evidentiary hearing, establishes that a monetary sanction against Mr.

Quiroz would be uncollectible.[8]

There is also an absence of any non-monetary sanction short of dismissal that is an appropriate response to Mr. Quiroz's acts. As this Court stated in another case involving litigants who had perjured themselves and attempted to fabricate evidence:

> Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues.

*Vargas v. Peltz*, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995). Were this Court to bar the introduction of testimony from the witnesses mentioned in the FBI transcript only, and allow Mr. Quiroz a second chance to present his case on the merits, Mr. Quiroz would be given the opportunity to use more refined means in order to lure other witnesses into providing false testimony and thereby subvert the integrity of the judicial process without being detected. *Cf. Bernal v. All American Inv. Realty*, 479 F. Supp. 2d 1291, 1339 (S.D. Fla. 2006) ("Defendants, however, miss the point" by suggesting that reopening discovery is an appropriate sanction for bad faith discovery abuses, because "this Court simply cannot trust that Defendants have produced, or ever will produce, all discoverable evidence."). This is especially true in Mr. Quiroz's case, where his unremorseful willingness to dissemble under oath would frustrate any future attempts to detect his fraudulent maneuvering.

### IV.    CONCLUSION

In short, Mr. Quiroz was willing to tamper with essential fact witnesses is a breach so severe that it cannot be ignored simply because Defendants were capable of

---

[8] Defendants raised this point at the evidentiary hearing, and Mr. Quiroz did not contest it.

uncovering the scheme.

The Court finds, by clear and convincing evidence, that Mr. Quiroz attempted to pay Mr. Martinez $1,000 to offered perjured testimony in support of Mr. Quiroz's FLSA lawsuit, and that he made similar offers to other witnesses, such as Mr. Martinez's wife, Sandra, as well as another individual, Lauro Cabana.  Moreover, when Mr. Quiroz was confronted with the incriminating evidence against him, he dug himself a deeper hole by offering demonstrably false sworn statements in his opposition to Defendants' motion to dismiss.  Finally, Mr. Quiroz's inability to satisfy any monetary sanction, when compounded with the unavailability of any lesser sanction that would cure his breach and punish and deter future acts of impropriety, leave this Court with no alternative but to exercise its inherent authority and impose the ultimate sanction upon Mr. Quiroz.

It is accordingly

**ORDERED AND ADJUDGED** that

1. Defendants' Motion to Dismiss for Witness Tampering (DE # 37) is **GRANTED**.

2. Plaintiff's Amended Complaint (DE # 30, Ex. A) is **DISMISSED WITH PREJUDICE**.

**DONE AND ORDERED** in chambers in Miami, Florida on August 12, 2008.

*Andrea M. Simonton*
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies to:
All counsel of record